## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| 731 PHARMACY CORP. d/b/a IVAN PHARMACY, <br><br> *Plaintiff*, <br><br> v. <br><br> SURESCRIPTS, LLC, <br><br> *Defendant*. | Civil Action No. <br><br> **Class Action Complaint** <br><br> **Jury Trial Demanded** |

Plaintiff 731 Pharmacy Corp. d/b/a Ivan Pharmacy ("Ivan Pharmacy" or "Plaintiff"), on behalf of itself and all others similarly situated, files this complaint against Surescripts, LLC ("Surescripts") for violations of federal antitrust laws and state antitrust, consumer protection, and common laws. The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel.

## I.    NATURE OF THE CASE

1.    Surescripts, a health information technology firm, is involved in the electronic prescription—or e-prescription—industry in which it has engaged in a long-running anticompetitive scheme to maintain its monopolies over two markets: (1) electronic prescription routing ("routing") and (2) prescription eligibility analysis ("eligibility"), together referred to as "e-prescribing." Routing is the transmission of prescription and prescription-related information from a prescriber (physician)—via the prescriber's electronic health record ("EHR") system—to a pharmacy. Eligibility is the transmission of a patient's formulary and benefit information from

a payer—usually the patient's pharmacy benefit manager ("PBM")—to a prescriber's EHR

system.

2.     In 2009, Surescripts had monopolies over routing and eligibility. And because

both of these markets were poised to experience explosive growth due to federal incentives for e-

prescribing, Surescripts feared that other health information technology companies could

threaten its dominant positions. To neutralize these competitive threats, Surescripts took a series

of anticompetitive actions to protect and maintain its monopolies.

3.     Surescripts's conduct took multiple forms—locking pharmacies into onerous

contractual terms, threatening would-be competitors, and entering into blatantly anticompetitive

agreements with would-be competitors.

4.     First, Surescripts changed its pricing policies to require long-term exclusivity

from nearly all of its routing and eligibility customers. Surescripts designed its new pricing to

ensure that its customers would pay a higher price on all of Surescripts's transactions unless they

were "loyal" to Surescripts, *i.e.*, used Surescripts exclusively. With its 95%-plus share in both

markets, Surescripts knew that no competitor could ever offer customers enough savings to

compensate customers for the skyrocketing costs the customers would face by paying

Surescripts's higher "non-loyal" price on their remaining Surescripts transactions. Surescripts's

web of loyalty contracts prevented competitors from attaining the critical mass necessary to be a

viable competitor in either routing or eligibility. Those effectively exclusive contracts foreclosed

at least 70% of each market, eliminating multiple competitive attempts from other companies

that offered lower prices and greater innovation. Demonstrating Surescripts's deliberate

foreclosure campaign, one Surescripts vice president gloated about how Surescripts's loyalty

contracts scheme excluded a competitor, Emdeon Inc. (now known as Change Healthcare): "It[']s nice when a plan comes together."[1]

5. Second, Surescripts has engaged in a long-running campaign of threats and other non-merits-based competition to ensure that no other competitor could get a toehold in either market. As one example, when Allscripts Healthcare Solutions, Inc. ("Allscripts"), a large EHR system provider that was a customer of Surescripts, attempted to enter into a non-exclusive agreement with Surescripts in 2014 so that Allscripts could instead contract with Emdeon, Surescripts launched a series of threats—what senior Surescripts executives called their "nuclear missiles." In addition to monetary penalties, the threats included (1) barring Allscripts from using eligibility information obtained from Surescripts's network for Allscripts's electronic prior authorization transactions; (2) cutting Allscripts off from Surescripts's pharmacy directory; and (3) severing Allscripts's access to a separate service called medication history. These threats were intended to secure Allscripts's continued exclusive use of Surescripts and quash the threat from Emdeon.

6. Third, Surescripts eliminated the competitive risk posed by RelayHealth Corp. ("RelayHealth"), a subsidiary of McKesson Corporation, in routing. Surescripts feared that RelayHealth—with its extensive connections to many of the same customers Surescripts wanted to lock up via its loyalty scheme—had a "natural ability to capture 15-20% of transaction volume."[2] Surescripts understood that competition from RelayHealth would have "dropped the price [for routing] down to 2 or 3 cents at any time."[3] At the time, Surescripts's net price to

---

[1] Redacted Complaint at ¶4, *FTC v. Surescripts, LLC*, No. 1:19-cv-01080, (D.D.C. May 3, 2019) (ECF 26).

[2] *Id.* at ¶5.

[3] *Id.*

customers was approximately 10 times higher. To eliminate this competitive risk, in 2010, Surescripts entered into an agreement with RelayHealth that prohibited RelayHealth from competing in the routing market for six years. Although this agreement facially preserved the existing "value-added reseller" relationship between the two companies, Surescripts executives have repeatedly stated that, from Surescripts's perspective, the sole benefit of that ongoing relationship is that it sidelines RelayHealth as a competitor.[4] Although the formal non-compete is no longer in the agreement, strict contract provisions continue to prevent RelayHealth from competing against Surescripts in routing, ensuring that the routing market suffers from the effects of that non-compete today.

7. Surescripts's multifaceted anticompetitive scheme has been remarkably successful. Despite a massive increase in e-prescribing over the past decade, Surescripts has prevented any meaningful competition, maintaining at least a 95% share (by transaction volume) in both the routing and eligibility markets. Pharmacies, such as Plaintiff and members of the classes (defined below), have no commercially reasonable alternative to Surescripts for these "e-prescribing" services. As a result, Surescripts has been able to charge pharmacies unlawful, supracompetitive prices for over ten years.

8. All of this conduct did not go unnoticed by the federal government. On April 17, 2019, after an extensive investigation, the Federal Trade Commission ("FTC") filed a complaint in the United States District Court for the District of Columbia against Surescripts for engaging in anticompetitive conduct to maintain its monopoly for e-prescribing services. The FTC complaint, and the conduct at issue in this complaint, was first revealed publicly on April 24,

---

[4] *Id.*

2019 when FTC's complaint against Surescripts was unsealed. On January 17, 2020, the court denied Surescripts's motion to dismiss FTC's complaint.

9.      As a result of Surescripts's anticompetitive conduct, Plaintiff and class members have been injured in their business and property during the Class Period (defined below), and their injury is continuing. Plaintiff seeks injunctive relief, treble damages, and/or related relief under federal antitrust laws and state antitrust, consumer protection, and common laws.

## II.      JURISDICTION AND VENUE

10.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a) and 15 U.S.C. § 15. This action alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and seeks injunctive relief. Those violations are actionable under section 16 of the Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C. §§ 1332(d) and 1367.

11.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. §§ 1391(b), (c), and (d). During the class period (January 1, 2010 to the present), Surescripts has transacted business, been found, or had agents in this District.

12.      The Court has personal jurisdiction over Surescripts. Surescripts has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Surescripts's conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

III.     **THE PARTIES**

13.     Plaintiff Ivan Pharmacy is a New York corporation with its principal place of business at 691 Columbus Ave, New York, NY 10025. Ivan Pharmacy indirectly paid Surescripts for e-prescription routing charges through its vendor Micro Merchants Systems.

14.     Defendant Surescripts is a Delaware limited liability company with its principal place of business at 2800 Crystal Drive, Arlington, Virginia 22202. Except where otherwise specified, "Surescripts" refers to Surescripts, LLC and all corporate predecessors, subsidiaries, successors, and affiliates.

IV.     **BACKGROUND**

    A.     **Electronic prescribing consists of two transactions.**

15.     E-prescribing is the electronic transmission of prescription or prescription-related information between a prescriber (through the prescriber's EHR system), a pharmacy, and a payer (usually a PBM), either directly or through an intermediary.

16.     E-prescribing developed as a safer, more accurate, efficient, and lower-cost means for prescribers (via their EHR systems), pharmacies, and PBMs to communicate and process patient prescriptions. The benefits of e-prescribing include fewer errors due to poor handwriting (an EHR is just the electronic version of a patient's medical chart), greater awareness of potential adverse drug interactions, more effective communication of a patient's insurance coverage and generic alternatives, and increased adherence (the likelihood that a patient will pick up a prescription at a pharmacy after leaving the prescriber's office).

17.     The core e-prescribing services are routing and eligibility. Although these two services are usually provided to prescribers together in the same workflow, each serves a separate purpose, delivers different information, and involves different customers.

18.     Routing is the transmission of prescription and prescription-related information between the prescriber's (physician's) EHR system and a pharmacy, including the transmission by a pharmacy to a prescriber's EHR system of a prescription refill request.

19.     Eligibility is the transmission of a patient's formulary and benefit information from a PBM to a prescriber's EHR system prior to the patient's appointment. This information allows a prescriber to know, for example, which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, and what copay (if any) a patient will have to pay to obtain a prescribed drug. Eligibility also informs the prescriber of lower-cost alternatives, such as generic drugs.

20.     The following diagram[5] provides an illustration of the various participants in the e-prescribing process:

---

[5] The diagram is based on information and a schematic published by U.S. Department of Health and Human Services. *See* HRSA, "How does e-prescribing work," *available at* https://web.archive.org/web/20120916052518/http://www.hrsa.gov/healthit/toolbox/HealthITAdoptiontoolbox/ElectronicPrescribing/epreswork.html



21. The key role that Surescripts plays, as described in more detail below, underlies the entire diagram: Surescripts provides the network that connects prescribers, EHR systems, pharmacies, and PBMs to one another.

22. Each of the routing and eligibility transactions is governed by its own industry-wide standard created by the National Council for Prescription Drug Programs ("NCPDP"). There is no patent or other intellectual property protection for either the routing or the eligibility transactions.

**B. Routing and eligibility: a "chicken-and-egg problem."**

23. Providing routing requires building a network (or platform) that links a prescriber's EHR system to pharmacies. Providing eligibility requires building a network (or platform) linking a prescriber's EHR system to PBMs. Surescripts provides both networks. Platforms with two sides, such as these, experience what economists refer to as "indirect network

effects," meaning that the value to participants on one side increases when there are more participants on the other side.

24.     Both routing and eligibility have significant indirect network effects. For routing, pharmacies get more value from a network used by more EHR system providers because there are more prescribers (physicians) who can send patients to those pharmacies to purchase the patients' prescribed drugs. And EHR system providers get more value from a network that connects to more pharmacies because prescribers can send prescriptions to more pharmacies, which increases the likelihood that patients will be able to use their preferred pharmacy.

25.     Similarly, for eligibility, PBMs get more value from a network used by more EHR system providers, as the increased distribution of a PBM's formulary and benefit information helps more physicians prescribe on-formulary drugs and thereby saves PBMs more money. And EHR system providers get more value from a network that connects to more PBMs because EHR system providers are able to obtain more complete insurance benefit information, such as for those patients who have multiple insurers.

26.     Another feature of many two-sided networks is that customers on one side of the network will not join the network unless they are confident that they will be able to access enough customers on the other side and thereby derive enough value from using the network. Neither side will join unless they believe the other side will. This gives rise to what economists refer to as the "chicken-and-egg problem." Solving this coordination problem is key to developing a viable platform.

27.     Routing and eligibility both face the chicken-and-egg problem. For routing, a network is unlikely to persuade an EHR system provider to join the network, and incur the costs associated with connecting, unless the provider believes that it will be able to access a substantial

number of pharmacies on that network. And a routing network is unlikely to convince a pharmacy to join the network, and incur the costs associated with connecting, unless the pharmacy believes that it will be able to access a substantial number of EHR system providers participating in that network.

28.     For eligibility, a network is unlikely to persuade an EHR system provider to join the network, and incur the costs associated with connecting, unless the EHR system provider believes that it will be able to access a substantial number of PBMs on that network. And an eligibility network is unlikely to convince a PBM to join the network, and incur the costs associated with connecting, unless the PBM believes that it will be able to access a substantial number of EHR system providers participating in that network.

29.     Creating viable routing and eligibility networks requires solving the chicken-and-egg problem and providing sufficient value to both sides of these platforms. Economists recognize that to solve the chicken-and-egg problem, networks must get a "critical mass" of customers on both sides to sign up. If a network cannot get a critical mass on both sides, then it is unlikely to be able to operate a viable platform.

30.     In submissions to the FTC, Surescripts has acknowledged that the chicken-and-egg problem exists as a barrier to entry in each of the markets for routing and eligibility.

31.     For a new platform, there should be two ways to achieve critical mass: (1) by getting customers who have not signed on to any platform or (2) by getting customers that use an existing platform. Because nearly all routing and eligibility customers use Surescripts's platform, would-be competitors generally must compete for customers already using Surescripts's routing and eligibility platforms. And because customers often prefer to avoid the cost and risk of a complete switch to an entrant, the entrant is most likely to win business through convincing

customers to use both its *and* Surescripts's platforms. Economists refer to the use of more than one platform simultaneously as "multihoming." Customers want to multihome because it encourages price competition and innovation in e-prescribing, and a small handful do multihome.

32.     As alleged below, Surescripts intentionally set out to substantially increase all routing and eligibility customers' costs to multihome, significantly elevating the critical mass a Surescripts competitor would need to become a viable network in either routing or eligibility. Absent Surescripts's conduct, entrants in routing and/or eligibility would have used multihoming to overcome the chicken-and-egg entry barrier through normal, market-based competition.

**C.      Due to federal policies and incentives, the e-prescribing industry has experienced extraordinary growth.**

33.     In 2008, there had been limited adoption of e-prescribing by prescribers. Congress thus acted twice to encourage expansion of e-prescribing given its many benefits.

34.     First, on July 15, 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"). MIPPA, through regulations implemented by the Centers for Medicare and Medicaid Services ("CMS"), adopted a carrot-and-stick approach to encourage prescribers to e-prescribe. As the carrot, MIPPA provided financial incentives to prescribers that were equivalent to reimbursement bonuses based on each prescriber's total charges for professional services to Medicare and Medicaid. As the stick, MIPPA established penalties in the form of reduced Medicare and Medicaid reimbursements to prescribers if a prescriber was not a "successful electronic prescriber."[6] To be considered a successful electronic prescriber under MIPPA, a prescriber must use an EHR system that, among other things, allows the prescriber to

---

[6] MIPPA §132, 42 U.S.C. § 1395w-4 (2012).

obtain eligibility information and "electronically transmit prescriptions" for a specified fraction of total prescriptions.

35.    Second, on February 17, 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), which further expanded the regulatory regime CMS implemented to grow e-prescribing. The HITECH Act encourages the "meaningful use" of EHR system providers throughout the United States. It does so by authorizing carrot-and-stick financial incentives and payment reductions to prescribers depending on whether they "meaningfully used" EHR technology. Through today, CMS has paid out over $38 billion in meaningful use financial incentives, which does not account for the effect of the potential penalties.

36.    One meaningful use objective is the ability to "[g]enerate and transmit . . . prescriptions electronically."[7] To prescribe electronically—and thus obtain the financial incentives and later avoid penalties described above—prescribers (via their EHR systems) need to connect to pharmacies and PBMs.

37.    From 2008 to 2016, the number of routing and eligibility transactions grew over 23-fold, from 147 million to 3.5 billion, and the percentage of U.S. physicians e-prescribing grew to nearly 70%. In 2017, 77% of all prescriptions were delivered electronically.

38.    This growth was primarily driven by MIPPA and the HITECH Act. As Surescripts noted in 2014, "We believe the dramatic growth in adoption and use [of e-prescribing] is a function of the combined forces of federal financial incentives and an aggressive

---

[7] *See* CMS, "Medicare & Medicaid EHR Incentive Program: Meaningful Use Stage 1 Requirements Overview" (2010), *available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/MU_Stage1_ReqOverview.pdf.*

response by the technology sector."[8] In testimony quoted in FTC's complaint, Surescripts's former CEO Harry Totonis said that "meaningful use totally helped e-prescribing happen."[9]

**D.    Surescripts's formation and growth.**

39.    Surescripts, LLC was formed on May 9, 2008, through a merger of two companies: RxHub LLC ("RxHub") and SureScripts Systems, Inc. ("SureScripts Systems"). RxHub was the first major eligibility network. It was founded in 2001 by three large PBMs, CVS Caremark Corp. ("CVS"), Express Scripts, Inc. ("Express Scripts"), and Medco Health Solutions, Inc. SureScripts System was formed six months later by two pharmacy trade groups, the National Association of Chain Drug Stores ("NACDS") and the National Community Pharmacists Association ("NCPA"). SureScripts Systems primarily focused on routing.

40.    As a result of the merger, Surescripts possessed at least 95% of the routing market (by transaction volume) and at least 95% of the eligibility market (by transaction volume).

41.    Surescripts is currently owned by CVS (17%), Express Scripts (33%), NACDS (25%), and NCPA (25%).

42.    Surescripts provides connections between EHR system providers, pharmacies, and PBMs for routing and eligibility.

43.    Surescripts charges pharmacies a fee for each routing transaction. Surescripts issues those charges either directly or, as in the case of Plaintiff, indirectly via a reseller or other third-party intermediary, such as a pharmacy technology vendor ("PTV"). Here, Surescripts charges Plaintiff indirectly through its PTV, Micro Merchant Systems.

44.    Surescripts charges PBMs a fee for each eligibility transaction.

---

[8] Redacted Complaint at ¶39, *FTC v. Surescripts, LLC*, No. 1:19-cv-01080, (D.D.C. May 3, 2019) (ECF 26).

[9] *Id.*

45. Surescripts pays EHR system providers a fee for each routing and eligibility transaction, but only if the EHR system provider uses Surescripts exclusively. The industry commonly refers to these disbursements as "incentive payments."

46. Surescripts follows the NCPDP standards for routing and eligibility transactions.

47. Surescripts creates and manages its own certification processes for its network, which means that customers (*i.e.*, EHR system providers, pharmacies, PBMs, and intermediaries) must obtain certification from Surescripts and sign a contract before they can use Surescripts's network.

## V. ANTICOMPETITIVE CONDUCT

48. In 2009, Surescripts, with its extensive connectivity to e-prescribing stakeholders, was well positioned to benefit from enormous growth in routing and eligibility, which was catalyzed by MIPPA, the HITECH Act, CMS regulations, and a broader movement towards computerizing health records. Surescripts foresaw a vast and untapped market. However, other companies saw the same potential.

49. Surescripts faced substantial competitive threats to its routing and eligibility monopolies and was concerned that competition would drive the "commoditization" of routing and eligibility, reduce prices for each, and "devastate" Surescripts's cash flow.[10]

50. In late September 2009, Surescripts's management explained to its board of directors that these "competitive pressures require precipitous price drops, down near or below our average unit costs (~5c)" and that, should Surescripts "lose 2-3 midsize pharmacy customers or a large PBM" to a competitor, "Surescripts would not be financially viable."[11]

---

[10] *Id.* at ¶56.

[11] *Id.* at ¶57.

51.     To prevent lower prices from competition, Surescripts substantially raised nearly all its customers' costs to multihome, rendering the chicken-and-egg problem unsurmountable for a competitor. The result has been the total exclusion of all meaningful competition in routing and eligibility, higher prices, reduced innovation, lower output, and no customer choice.

**A.      Surescripts learns of an emerging threat to its monopolies.**

52.     On July 1, 2009, a health information technology company called Emdeon (n/k/a eRx Network) acquired eRx Network, a competing routing network. Although eRx Network only transmitted approximately 5% of routing market transactions at that time, it was well-positioned for significant growth given its connectivity with Allscripts, a large EHR system provider, and PDX, a PTV providing routing connectivity that marketed primarily to medium-to-large sized retail pharmacy chains.

53.     Surescripts recognized that competition from Emdeon would "drive lower prices."[12]

54.     On July 22, 2009, Surescripts's Chief Strategy Officer, Scott Barclay, explained that with "lower prices and further capabilities, the new Emdeon could significantly compete" with Surescripts.[13]

55.     If Emdeon could provide lower prices to pharmacies, higher incentives to EHR system providers, or both, Emdeon could attract enough customers to its routing network and solve the chicken-and-egg problem. Surescripts understood that if additional customers were to multihome with Emdeon, "[t]hen it becomes a price game at pharmacy and an incentive game at

---

[12] *Id.* at ¶60.
[13] *Id.* at ¶61.

the POC [point of care, *i.e.*, prescribers/EHR system providers]. . . . [E]ach network fights for itself and the market share game becomes paramount quickly."[14]

56.     Surescripts thus acted to eliminate the outbreak of competition—an outcome where one set of customers (pharmacies and PBMs) would pay lower prices, another set of customers (EHR system providers) would receive higher incentive payments—so that it did not lose its supracompetitive profits.

> **B.     Surescripts responds to competition by devising and implementing an anticompetitive web of exclusive contracts.**

57.     In response to the threat from Emdeon and other competitors, Surescripts, with its 95%-plus established share in both markets, sought to eliminate all competition by significantly raising its customers' costs to multihome, thereby dramatically increasing the critical mass necessary for a Surescripts competitor to become viable. Surescripts did so by blanketing the markets for routing and eligibility with loyalty pricing and exclusivity contracts.

58.     Beginning in mid-2009, Surescripts devised a scheme to include "loyalty" provisions in contracts with customers on both sides of the routing and eligibility markets, which conditioned discounts or payments on actual or de facto exclusivity. Loyalty discounts apply to Surescripts's pharmacy, PTV, and PBM, and EHR system provider customers.

> **1.     The structure of Surescripts's pharmacy, PTV, and PBM contracts.**

59.     For pharmacies and PTVs to receive a loyalty discount, a customer must be exclusive to Surescripts. To be considered exclusive, Surescripts requires that its pharmacy and PTV customers route 100% of their transactions "through and only through the Surescripts network."[15] This requirement only applies to Surescripts-connected entities, but because

---

[14] *Id.* at ¶62.

[15] *Id.* at ¶66.

Surescripts maintains connectivity to nearly all EHR systems, this provision effectively requires 100% exclusivity from pharmacies and PTVs. Surescripts generally refers to these exclusive customers as "loyal" customers and those that are not exclusive as "non-loyal." The same structure exists for PBMs in eligibility.

60.     Under these loyalty provisions, because pharmacies, PTVs, and PBMs must use Surescripts for all or nearly all of their transactions, becoming non-exclusive and losing the loyalty discounts results in a significant cost increase. Surescripts's loyalty pricing scheme therefore substantially increases the cost of multihoming through a second network for nearly all pharmacies, PTVs, and PBMs. Notably, although the difference in the per-transaction price between a loyal and non-loyal transaction is often just a few pennies, many pharmacy chains and PBMs send millions of transactions across the Surescripts network, and a difference of a few pennies results in hundreds of thousands or even millions of dollars in cost increases.

61.     These non-loyal per-transaction prices (which are additional costs to customers) are not justified by any increased costs faced by Surescripts in transmitting routing or eligibility information. Rather they exist only to act both as penalties to those customers that may consider being non-loyal to Surescripts and as an exclusionary tactic against any competitor in routing or eligibility, thus reinforcing and maintaining Surescripts's monopolies in routing and eligibility.

62.     In many contracts, Surescripts also requires customers to pay the price differential between the loyal and non-loyal price for historical transaction volume retroactive over the term of the contract. For many customers, these additional clawback obligations total millions of dollars and substantially strengthen the lock-up effect of the contracts.

63. Surescripts refers to these clawback provisions as the "teeth" of its loyalty contracts.[16]

64. A PTV customer contract quoted in FTC's complaint provides an illustrative example of the "teeth" of Surescripts's contracts:

> If, during the Loyalty Term, Aggregator . . . ceases to route all of its electronic Prescription Routing messages to Prescribing Participants through, and only through, the Surescripts network and fails to cure within the applicable cure period, then Surescripts shall immediately cease calculating the Loyalty Discount and Aggregator agrees to pay Surescripts the amount of the Loyalty Discount received by Aggregator during the Loyalty Term.

65. Similarly, a PBM customer contract quoted in FTC's complaint provides:

> If, during the Loyalty Term, PBM ceases to route all of its electronic Prescription History and Benefit (Ambulatory) messages to Participants through, and only through, the Surescripts network, then Surescripts shall immediately cease applying the Loyalty Eligibility Transaction Fee price and PBM agrees to pay Surescripts the difference in the amount of Transaction Fees PBM would incur had PBM paid the [non-loyal price] versus the [loyal price] as of the Amendment Effective Date.

**2. The structure of Surescripts's EHR system provider contracts.**

66. Surescripts imposes the same loyalty scheme on companies that provide EHR systems, except in reverse by conditioning any incentive payments on an EHR system provider's exclusivity to Surescripts for routing, eligibility, or both.

67. Under the loyalty program as implemented for most EHR system providers, if an EHR system provider agrees to be exclusive only in routing, Surescripts pays that firm an incentive fee related to the routing fee paid by pharmacy customers to Surescripts for each routing transaction. If an EHR system provider agrees to be exclusive only in eligibility, Surescripts pays that firm an incentive fee related to the eligibility fee paid by PBM customers to

---

[16] *Id.* at ¶73.

Surescripts. If the EHR system provider agrees to be exclusive in both routing and eligibility, Surescripts pays that firm a higher incentive fee on both transactions. Nearly all EHR system providers participating in the loyalty program agree to exclusivity on both transactions.

68.     If an EHR system provider decides to multihome and use Surescripts for less than 100% of its transactions, Surescripts terminates incentive fees to that firm. In other words, Surescripts raises the EHR system provider's price by reducing the EHR system provider's incentive fees to zero. As with the penalty price Surescripts charges non-loyal pharmacies, PTVs, and PBMs, there are no legitimate competitive reasons (e.g., increased costs) for Surescripts to raise its price to zero for non-loyal EHR system providers.

69.     As with its clawback provisions to pharmacies, PTVs, and PBMs, Surescripts also requires EHR system providers to pay back the incentive fees for historical transaction volume if the EHR system provider violates the exclusivity commitment. Some contracts require repayment on transactions over the full term of the contract. For example, Surescripts's April 14, 2010 contract with one EHR system provider quoted in FTC's complaint states:

> If, during the Loyalty Term, Surescripts determines that
> Aggregator . . . has failed to comply with the loyalty requirements .
> . . Aggregator shall promptly pay back to Surescripts the amount of
> Incentive Fees paid by Surescripts to Aggregator during the
> Loyalty Term, and Aggregator shall no longer receive the
> Incentive Fees.

### 3.     Surescripts structured the contracts to lock up the routing and eligibility markets.

70.     Surescripts implemented loyalty pricing and exclusivity requirements to make the chicken-and-egg problem insurmountable for any competitor in either routing or eligibility (or both). Specifically, Surescripts's loyalty program substantially raises its customers' costs to multihome, significantly elevating the critical mass a competing platform would need to become viable, rendering the chicken-and-egg problem unsurmountable. As Surescripts explained in a

presentation to its board, the new loyalty strategy would "[p]rotect [Surescripts's] most critical asset—[its] network—by addressing competitive market pressures and locking-in key customers."

71.    Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility have an initial term of three years or more. With some larger customers, the terms are as long as five years.

72.    Surescripts prefers to employ long-term contracts because they enable Surescripts to lock up its customers, preventing them from using a competitor's network. As Surescripts's then-Vice President of Account Management explained in a February 2010 email to the company's then-CEO, "[o]ur 3 year commitments keep[] our competition out of those customers."[17]

73.    Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility automatically renew for one year unless either party gives notice.

74.    In early 2010, as demand for routing and eligibility was growing and inviting entry, Surescripts began executing loyalty pricing with nearly all of its e-prescribing customers. Most of these contracts had an effective date retroactive back to January 1, 2010.

**C.    Surescripts uses RelayHealth to extend the reach of its exclusive contracts and solidify its monopolies.**

75.    While Surescripts was able to push its loyalty pricing and exclusive contracts onto its direct customers, Surescripts was only able to lock up customers with whom Surescripts had a direct contract. But Surescripts was also concerned about a large subset of customers that it did

---

[17] *Id.* at ¶85.

not have direct contracts with (and thus did not have exclusivity commitments from)—namely those customers that connected to Surescripts through RelayHealth.

76.     Since 2003, RelayHealth has contracted with Surescripts to resell routing services over the Surescripts network to a subset of pharmacy and PTVs. RelayHealth contracts with these pharmacies and PTVs, but Surescripts does not. RelayHealth also provided Surescripts's routing connectivity to some EHR systems until 2015, although it no longer does except for those EHR systems associated with McKesson.

77.     Surescripts sells routing to RelayHealth at a "wholesale" rate on a transaction-by-transaction basis. RelayHealth then resells the transaction to a subset of pharmacies and PTVs at a higher "retail" rate. RelayHealth profits from the margin between the retail rate pharmacies and PTVs pay RelayHealth and the lower wholesale rate RelayHealth pays to Surescripts. All else equal, the lower Surescripts's wholesale rate to RelayHealth, the higher RelayHealth's margin.

78.     Through two contracts, one executed in 2010 and a second executed in 2015, Surescripts provided RelayHealth with contractual and monetary incentives to convince RelayHealth's routing customers to be loyal to the Surescripts routing network.

79.     In the February 25, 2010 contract ("the 2010 contract") between Surescripts and RelayHealth, RelayHealth was required to use "commercially reasonable efforts to offer terms to incent exclusive use of the Surescripts network" by pharmacies, PTVs, and EHR system providers and to assist Surescripts in clawing back any incentive fees from EHR system providers.

80.     Under the 2010 contract, if a RelayHealth customer maintained a certain level of exclusivity to Surescripts, Surescripts discounted its wholesale price to RelayHealth for that customer. Pursuant to the 2010 contract, RelayHealth entered into contracts with its pharmacies

and PTVs for routing through the Surescripts network. Nearly all of these contracts went beyond the Surescripts requirement and mandated that these customers use RelayHealth exclusively (i.e., for 100% of their required transactions). Because RelayHealth was exclusive to Surescripts, this provision resulted in nearly all of RelayHealth's pharmacy and PTV customers routing all of their transactions through Surescripts. As an October 2012 RelayHealth presentation put it, RelayHealth's strategy was to "[m]ove non-exclusive customers to exclusive wherever possible."[18]

81.     RelayHealth also provided Surescripts with feedback as to RelayHealth's customers' exclusivity status. For example, in 2012, Surescripts instructed RelayHealth to inquire into the loyalty status of a routing customer called Transaction Data Systems d/b/a Rx30 ("Rx30"). RelayHealth did so and informed Surescripts that Rx30 was not loyal.

82.     Under the 2010 contract, RelayHealth also entered into contracts with EHR system providers for routing through the Surescripts network. These contracts were typically for a length of two years or more, contained express exclusivity requirements to RelayHealth, and provided incentive payments to EHR system providers only if they were 90-100% exclusive to the Surescripts network. Again, because Surescripts was the only routing network to which RelayHealth provided access, this provision resulted in nearly all of RelayHealth's EHR system provider customers routing all of their transactions through Surescripts. For each exclusive routing transaction, Surescripts paid RelayHealth an incentive payment. RelayHealth then passed a portion of those incentives on to its EHR system provider customers but only if they met RelayHealth's exclusivity requirements.

---

[18] *Id.* at ¶93.

83.     RelayHealth's contracts with its EHR system provider customers also required repayment of all incentive fees paid to the customer if the customer failed to comply with RelayHealth's exclusivity requirement.

84.     In the next contract, signed on January 16, 2015 ("the 2015 contract"), Surescripts renewed its 2010 contract with RelayHealth with modifications. The contract provided RelayHealth with a higher wholesale discount for exclusive transactions; increased the loyalty threshold and, instead of determining loyalty on a customer-by-customer basis, determined loyalty on a platform-wide basis.

85.     As explained in more detail in Section V.F.3. below, the 2015 contract also required RelayHealth to transfer its connections with EHR system providers to Surescripts. RelayHealth therefore no longer provides routing connectivity to EHR system providers, except for EHR system providers associated with McKesson.

86.     Under the 2015 contract, RelayHealth has not changed its contracts with its end-user pharmacy and PTV customers to resell Surescripts's routing connectivity. Thus, RelayHealth's contracts for Surescripts's routing network continue to require 100% exclusivity through today.

**D.      Surescripts locks up a critical EHR system provider and engages in a campaign of threats to enforce its exclusivity provisions.**

87.     While implementing this web of loyalty and exclusive contracts, Surescripts devoted special attention and resources to locking up a critical EHR system provider: Allscripts. In 2009, Allscripts represented approximately 25% of Surescripts's routing and eligibility transactions, making it a significant customer for any e-prescribing network. Allscripts's EHR technology relied on a centralized "hub" infrastructure for all of its customers, meaning that if Allscripts multihomed with an additional e-prescribing network, the added e-prescribing network

could quickly route e-prescriptions to and from Allscripts's entire e-prescribing customer base. Allscripts's exclusivity was critical to Surescripts for two reasons: (1) Allscripts was one of the few EHR system providers that was multihoming, using Emdeon as an alternative routing network to Surescripts, which made Emdeon a more viable threat to Surescripts; and (2) Allscripts had implemented a new business model in eligibility that cut out Surescripts as the middleman.

88.     First, Allscripts had contracted with Emdeon for routing since 2007. This connection allowed Allscripts to route prescriptions to Emdeon's pharmacy customers without utilizing the Surescripts network. Emdeon paid Allscripts a routing transaction incentive fee that was higher than what Surescripts paid Allscripts.

89.     Surescripts recognized that Allscripts was crucial to Emdeon gaining scale in routing, overcoming the chicken-and-egg problem, and offering increased competition and lower prices. Access to Allscripts's routing transaction volume (through its prescribers) made Emdeon more attractive to potential pharmacy customers. In a November 17, 2009 email, a senior Surescripts executive wrote that in order to prevent Emdeon from solving the chicken-and-egg problem, "[t]he key to Emdeon is Allscripts[] (i.e., the key to fighting eRx networks [Emdeon] is containing their access to POC [point of care, i.e., prescribers])."[19]

90.     Second, in September 2009, before Surescripts implemented its loyalty and exclusive contracts, Surescripts learned that Allscripts was transmitting eligibility requests around Surescripts's network directly to a PBM called SXC Health Solutions. This practice of developing "direct connections" for eligibility with PBMs represented a different means for Allscripts to receive eligibility information from PBMs and, more broadly, a different model for

---

[19] *Id.* at ¶102.

e-prescribing, one that cut out Surescripts as a middleman. From Surescripts's perspective, Allscripts's development of direct connections to PBMs made Allscripts "a major competitor and our largest current risk" in eligibility.

91.     By May 2010, Allscripts sold or was attempting to sell direct connections to its prescriber network to at least six PBMs, often at prices below Surescripts's.

92.     PBMs hoped their relationships with EHR system providers would create a more competitive, innovative market that would exert pressure on Surescripts to innovate. Many customers have complained that Surescripts's eligibility transaction is "not a reliable process" because it provides only static, non-patient specific formulary information.

93.     Surescripts realized that Allscripts's direct eligibility connections were "a long-term potential threat[] coming true."

### 1.     Surescripts locks up Allscripts in 2010.

94.     Facing these threats, Surescripts implemented a "full combat strategy" to "lock up . . . Allscripts" through an exclusive contract with Allscripts, which Allscripts and Surescripts signed on May 31, 2010.

95.     As the preamble to that contract states, "the purpose of this [agreement] is to enter into a long term arrangement for [Allscripts] to utilize Surescripts exclusively" for both routing and eligibility.

96.     The 2010 contract had a term of four years and included several provisions tailored specifically to Allscripts to ensure exclusivity from Allscripts for both routing and eligibility.

97.     First, Surescripts required Allscripts to terminate its routing connection to the Emdeon network at the expiration of Allscripts's contract with Emdeon in June 2013. Allscripts agreed to this requirement to avoid losing access to Surescripts's network. Surescripts's network

is a "must-have" for nearly all EHR system providers because their systems must connect to pharmacies and PBMs to e-prescribe. Allscripts terminated its relationship with Emdeon on June 20, 2013.

98.    Second, Surescripts grandfathered in Allscripts's current direct connections with PBMs but prohibited Allscripts from renewing its eligibility contracts with those PBMs and from proactively marketing or entering into new eligibility agreements with PBMs.

99.    Third, Surescripts imposed a "right of first refusal" procedure on Allscripts's e-prescribing business: if any third party sought to do business with Allscripts in either routing or eligibility, Allscripts was required to set up a meeting with Surescripts and that third party "to facilitate a connection between such [third party] and Surescripts."[20] Only if the third party did not want to do business with Surescripts after this meeting could Allscripts engage in business discussions with the third party for routing or eligibility.

100.    Fourth, Surescripts required Allscripts to remind its sales and business development personnel annually of the above terms, and Surescripts maintained the right to "review and comment" on such annual reminders.[21]

101.    Surescripts realized that Allscripts was key to crushing Emdeon's ability to expand and quashing any alternative e-prescribing business model via Allscripts's direct connections to PBMs. Surescripts thus provided Allscripts with "enhanced" or "relatively more attractive revenue sharing."[22] Specifically, Surescripts paid Allscripts an incentive portion of the routing and eligibility fees paid by pharmacy and PBM customers for each transaction, substantially more than similarly situated EHR system providers. An internal Surescripts

---

[20] *Id.* at ¶113.
[21] *Id.* at ¶114.
[22] *Id.* at ¶115.

presentation described an early version of its 2010 deal with Allscripts by including a picture of the movie poster from the 2009 film "The Proposal," which included the slogan "HERE COMES THE BRIBE."

### 2. Surescripts locks up Allscripts again in 2015.

102.    In 2014, though Surescripts had successfully forced Allscripts to sever its routing connection with Emdeon, Surescripts still worried that Allscripts would restart multihoming, using Emdeon as an alternative, which would, in the words of Greg Hansen, Surescripts's then-Executive Vice President and Chief Customer Officer, "create what is essentially a bidding war for [Allscripts prescribers'] transactions or access to their physician community."[23]

103.    That same executive feared that Allscripts "intend[ed] to monetize access to their physician community," and Surescripts's CEO wrote that Allscripts "[is] counting on defection from our owners to shift the balance of economic power from Pharmacies/PBMs to Physicians."[24]

104.    To stifle this "bidding war" and maintain this "balance of economic power," Surescripts engaged in a renewed campaign to force Allscripts into exclusivity.

105.    In the second half of 2014, Surescripts threatened to withhold Allscripts's access to Surescripts's "must-have" e-prescribing network for routing and eligibility. Allscripts in turn feared that "Surescripts would have cut us off" if Allscripts did not sign a new exclusive agreement with Surescripts.[25]

106.    During the same time period, to secure Allscripts's exclusivity, Surescripts also threatened (1) to bar Allscripts from using eligibility information obtained from Surescripts's

---

[23] *Id.* at ¶118.
[24] *Id.* at ¶119.
[25] *Id.* at ¶121.

network for Allscripts's electronic prior authorization transactions, which increases efficiency between prescribers and pharmacies by reducing the time it takes to receive pre-approval for certain prescription drugs from a patient's insurer; (2) to cut Allscripts off from Surescripts's pharmacy directory, which is necessary to allow a prescriber to locate a patient's preferred pharmacy; and (3) to sever Allscripts's access to a separate service called medication history, which Allscripts's prescribers used in both acute and ambulatory settings.

107.    Surescripts also sought to impose a penalty on Allscripts by making Allscripts pay millions of dollars if Allscripts did not enter into an exclusive agreement. For example, Surescripts sent Allscripts a retroactive invoice for Allscripts's use of what was supposed to be a separate free service offered by Surescripts if Allscripts did not agree to the exclusivity terms Surescripts had proposed. Surescripts also withheld loyalty incentive payments to Allscripts until Allscripts signed the contract.

108.    Surescripts referred to these tactics as "nuclear missile[s]" and admitted they were designed to ensure that Allscripts would continue to use Surescripts exclusively. Both Surescripts and Allscripts understood that these tactics were meant to "exert leverage" over Allscripts to force it to sign an exclusive agreement for routing and eligibility.[26]

109.    During this same period, Emdeon again attempted to sign Allscripts up as a customer by, for example, offering Allscripts increasingly large up-front payments and profit-sharing arrangements to compensate Allscripts for losing Surescripts's incentive fees.

110.    Despite Emdeon's efforts, Surescripts's tactics with Allscripts were successful. On January 31, 2015, Allscripts signed a new amendment with Surescripts, extending the term of the underlying exclusive contract for five years.

---

[26] *Id.* at ¶124.

111.    On June 29, 2018, after Allscripts and Surescripts became aware that the FTC was investigating their conduct, Allscripts and Surescripts entered into a new amendment that deleted some of the more restrictive provisions contained in the 2010 Allscripts-Surescripts agreement and the 2015 amendment. That 2018 amendment, however, did not alter the fact that Allscripts was still required to use Surescripts exclusively for routing and eligibility or face financial penalties.

E.    **Surescripts's scheme has succeeded in excluding all meaningful competition from both routing and eligibility.**

112.    Over the last 10 years, Emdeon attempted unsuccessfully to expand its presence in the routing market and, later, in the eligibility market. Beginning in 2009, Emdeon attempted to convince pharmacies and EHR system providers to use its network to route transactions, circumventing the Surescripts network. Doing so would require these pharmacies and EHR system providers to become non-loyal to Surescripts or RelayHealth and to pay back the discounts or incentive payments they had already received. In many cases, Emdeon approached these potential customers with lower per-transaction pricing than Surescripts charged, higher per-transaction incentive payments than Surescripts paid, and no loyalty requirements.

113.    However, Emdeon was not successful. Pharmacies and EHR system providers largely refused to connect to Emdeon, since doing so would trigger the massive penalty provisions in their contracts with Surescripts or RelayHealth and cost routing customers millions of dollars through increased prices or, for EHR system providers, decreased incentive payments. Because Emdeon could not expand its connectivity, it could not deliver low enough pricing on a high enough volume of transactions to make up for the huge penalties inflicted on any pharmacy or EHR system provider that chose to become non-loyal to Surescripts. That is, there was no

price (or incentive payment) that Emdeon could offer that would offset the penalty customers would receive by becoming non-loyal to Surescripts.

114.    Surescripts executives knew that its loyalty scheme was working as intended. They repeatedly admitted that Surescripts's web of exclusive contracts quashed any competitive threat. As Surescripts noted in a presentation to Rite Aid, a RelayHealth pharmacy, in early 2010, because of the loyalty scheme, there was no price Emdeon could offer that would reduce Rite Aid's total routing costs:[27]

## Clarifying the Issues 

### eRx/Emdeon cannot save Rite Aid money in e-prescription routing by splitting traffic:

- While eRx/Emdeon may offer a low introductory price, they can only do so for a subset of your transactions
- Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth
- The lowest transaction pricing from RelayHealth for Surescripts connectivity is only available when routing 100% of your transactions through us
- The total cost to Rite Aid to split traffic would therefore be higher than if you continue to route 100% through RelayHealth and Surescripts

Surescripts®                    Confidential and Proprietary

115.    In the above slide, Surescripts essentially admitted how its loyalty scheme disrupted the price-setting mechanism of the routing market.

116.    In September 2010, Surescripts articulated how its exclusive contracts restricted Emdeon's expansion and reduced its potential to reach critical mass:

---

[27] *Id.* at ¶130.

> Surescripts's efforts to lock in our customers through Loyalty
> program have likely had a strong impact to Emdeon's initial
> strategy. With most top Prescriber Venders signed to Loyalty
> Incentive plans, and, a significant portion of the Pharmacy industry
> signed to Loyalty pricing plans (direct and via [RelayHealth]),
> Emdeon's ability to expand their direct connection to prescribers
> and pharmacies has been greatly reduced. Emdeon's ability to
> rapidly become a full national alternative to Surescripts is
> diminished.[28]

117.    In October 2010, a Surescripts vice president, paraphrasing the line made famous
in the A-Team television series, boasted, "[T]he loyalty/incentive strategy and execution made a
very effective counter to the Emdeon/eRX acquisition. It[']s nice when a plan comes together."[29]

118.    In that same month, Surescripts described how its loyalty program foreclosed
Emdeon from the market by disabling Emdeon's ability to compete on price: "eRx/Emdeon can
undercut Surescripts on price, but only on a margin of volume . . . and Surescripts pricing
differential on pharmacy side and loyalty incentive program on POC side are worth more than
eRx / Emdeon's proposition on <10% of scripts."[30]

119.    When Emdeon's initial efforts to expand failed, Emdeon attempted a new strategy
designed to work around Surescripts's massive financial penalty provisions: reselling the
Surescripts routing transaction to a group of pharmacies that use a PTV called PDX. With the
PDX pharmacies disconnected from the Surescripts network, EHR system providers would be
free to route directly to Emdeon without incurring Surescripts's penalties for being non-loyal.
Thus, EHR system providers, under their Surescripts contracts, would not be penalized for
routing to a pharmacy that could not be reached using the Surescripts network. Despite an
organized campaign to attempt to sign up EHR system providers to such contingent contracts

---

[28] *Id.* at ¶132.

[29] *Id.* at ¶133.

[30] *Id.* at ¶134.

(where the EHR system provider would agree to route through Emdeon only if Emdeon disconnected its pharmacies from the Surescripts network), Emdeon was unable to execute enough contracts to obtain enough scale to become viable in e-prescribing and solve the chicken-and-egg problem. In the midst of this campaign, Allscripts severed its connection with Emdeon, as required by Allscripts's 2010 agreement with Surescripts, a move Emdeon described as a "devastating" blow[31] and one that pushed Emdeon almost completely out of the market.

120.    In late 2013, Emdeon again attempted to compete with Surescripts, this time in eligibility. Emdeon approached potential PBM customers with lower pricing than Surescripts as well as offers to innovate in ways that would respond to PBM complaints regarding the quality of Surescripts's eligibility service. Although Emdeon gained some traction, it ultimately could not acquire the critical mass of PBMs and EHR system providers needed to overcome Surescripts's loyalty provisions.

F.    **Surescripts ensures that RelayHealth does not compete in the routing market.**

121.    In 2003, Surescripts and RelayHealth signed an agreement in which RelayHealth expressly agreed not to compete with Surescripts in routing, meaning that while RelayHealth could resell Surescripts's routing services to certain customers, it could not compete with Surescripts by starting up its own routing network. As Surescripts was formulating its plan to push its exclusive contracts into the markets, Surescripts executives knew that their most recent agreement with RelayHealth was scheduled to expire on April 10, 2010 and, along with it, RelayHealth's contractual obligation not to compete against Surescripts in routing.

---

[31] *Id.* at ¶135.

1.     **Surescripts recognizes the threat of competition in routing from RelayHealth.**

122.    In an August 2008 strategic risk analysis memorandum, Surescripts executives recognized that RelayHealth and its corporate parent, McKesson, presented a "significant threat in the near to longer term," particularly the threat that "RelayHealth will create a competitive [routing] network to [Surescripts]." Such competition from RelayHealth would cause Surescripts to lose transaction volume but would produce consumer benefits in the form of lower prices, increased innovation, and more choice.[32]

123.    McKesson sells pharmaceutical and medical products as well as business services to pharmacies, hospitals, and health systems throughout North America and internationally. McKesson has sold and currently sells pharmacy management software to pharmacies. McKesson has also sold EHR systems to hospitals and other health systems. In fiscal year 2008, McKesson generated nearly $102 billion in total revenue and was ranked 15th on the Fortune 500 list.

124.    In a January 2009 Surescripts presentation titled "McKesson Strategy," Surescripts executives worried that failure to renew a contract with RelayHealth containing the routing non-compete would mean that the "[r]isk of RelayHealth becoming a competitor remains," leaving RelayHealth free to use its business relationships with pharmacies, PBMs, and EHR system providers to stand up its own routing network and go head-to-head with Surescripts. In the same presentation, Surescripts recognized that it "[m]ay not be able to compete on transaction fees due to lack of products/services to bundle pricing."[33]

---

[32] *Id.* at ¶138.
[33] *Id.* at ¶140.

125.    Surescripts executives understood that McKesson's ownership of RelayHealth "presents an additional threat to [Surescripts]." They recognized that McKesson was a "Fortune 15 Company" with "[$]1.4 billion in cash" and "[d]iverse product offerings that span many healthcare markets serving many key stakeholders in healthcare."[34]

126.    McKesson also provided RelayHealth with an immediate customer base, as McKesson had its own EHR and PTV offerings. In 2010, for example, McKesson owned and operated several EHR software platforms, including McKesson Horizon Clinicals, Practice Partner, and RelayHealth Consumer. McKesson also provided technology to pharmacies that included routing capabilities, including its PharmacyRx pharmacy management system.

127.    Surescripts realized that RelayHealth had a "natural ability to capture 15-20% of transaction volume" if RelayHealth started connecting just McKesson's own pharmacy and prescriber products, to say nothing about what gains RelayHealth would make if it started competing in routing more broadly.

128.    Surescripts executives also knew that RelayHealth had experience in a closely related market, claims adjudication, a service that allows pharmacies to bill a patient's insurer for a prescription, usually via the PBM contracted with the patient's insurer. Executives from both RelayHealth and Surescripts often referred to claims adjudication as an "adjacent" market to routing and eligibility. RelayHealth's experience provided it with a distinct advantage to standing up a routing network. RelayHealth already contracted with many pharmacies, PTVs, and PBMs for claims adjudication. RelayHealth's claims adjudication business and Surescripts's routing and eligibility business shared many of the same customers. In January 2009, Surescripts

---

[34] *Id.* at ¶141.

wrote that RelayHealth "plays in the same space as S[urescripts] (i.e. offering connectivity services to same customers)."

129.    Critically, RelayHealth also already had numerous contracts with both pharmacies and EHR system providers due to its reseller relationship with Surescripts. In 2009, RelayHealth connected approximately 50% of pharmacy routing transactions to the Surescripts network— including large pharmacies like Walgreens and Rite Aid—and approximately 40% of EHR routing transactions to the Surescripts network, including the large EHR system provider Allscripts. RelayHealth thus enjoyed an advantage held by no other competitor: it had already partially solved the chicken-and-egg problem by having relationships with customers on both sides of the routing network.

130.    Surescripts was concerned not only that RelayHealth would enter routing, but also that RelayHealth would offer a lower price that Surescripts would be unable to match. Surescripts executives believed in 2009 that the unit costs for claims adjudication were between one and two cents and that RelayHealth could bring its e-prescribing costs down to that price given its scale and McKesson's funding. At that time, Surescripts's e-prescribing unit costs were approximately 600% higher and its net price to customers approximately 10 times higher.

131.    Surescripts understood that, if RelayHealth "dropped the price down to 2 to 3 cents . . . they would have been able to take the business away from us." In testimony quoted in FTC's complaint, Surescripts's former Chief Strategy Officer also said that he believed RelayHealth would be able to enter at a lower price than Surescripts could offer:

> I assumed Relay and Emdeon would consider offering e-prescribing for what I estimated to be their marginal costs . . . or they might just try to undersell that and lose . . . to put us out of

business and then combine and bundle that with their other fixed cost infrastructures on the adjudication side.[35]

### 2. Surescripts eliminates the RelayHealth threat in 2010.

132. These fears dominated Surescripts's negotiations with RelayHealth. As a result, Surescripts's primary goal during negotiations was to "[m]aintain current status where RelayHealth does not become a competitor" or, as the same presentation explained, use a strategy where Surescripts would "keep friends close but enemies closer." RelayHealth's own internal documents show that since 2003, "[t]he dominant contracting strategy . . . [was] to prevent [RelayHealth] from competing [with Surescripts]."[36]

133. Surescripts achieved this goal. In its February 25, 2010 contract with RelayHealth, Surescripts obtained RelayHealth's renewed promise not to compete in routing for an additional six years. Surescripts has repeatedly admitted that the sole value of this 2010 contract is that it prevents RelayHealth from competing against Surescripts in routing. One 2012 memo, circulated to senior Surescripts executives, explicitly stated, "Our VAR contract prevents them from competing against us for core e-prescribing Routing. This was a substantial concern when we were founded [in 2008], and should still be a consideration today due to R[elay]H[ealth]'s vast market share in the Pharmacy financial Claims Processing part of our industry."[37]

134. As early as December 2008, Surescripts's own documents characterized its relationship with RelayHealth as adding very little, if any, value to e-prescribing and described RelayHealth as a "value subtract," writing that "the only real value that we are getting out of the

---

[35] *Id.* at ¶147.

[36] *Id.* at ¶148.

[37] *Id.* at ¶149.

RelayHealth relationship at this point is the exclusivity."[38] In 2013, Surescripts executives stated the only benefit it received from the 2010 contract with RelayHealth was that the contract "help[ed] keep market share."[39] In March 2014—four years into the five-year term of the 2010 contract—Surescripts executives were still asking themselves in a presentation entitled "RelayHealth Partnership Assessment," "How does Surescripts + RelayHealth = more value than Sur[e]scripts alone?"[40] Surescripts's then-Chief Customer Officer described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats."[41]

### 3. Surescripts eliminates the RelayHealth threat again in 2015.

135. In 2015, as Surescripts's agreement with RelayHealth was nearing expiration, Surescripts's fears of entry by RelayHealth persisted, and so it took renewed action to neutralize RelayHealth. On January 16, 2015, Surescripts and RelayHealth executed a three-year contract that automatically renewed each year unless either party terminated it and is still in place today. This contract (1) tightened RelayHealth's loyalty requirements; and (2) exchanged the explicit routing non-compete provision for an implicit one, requiring RelayHealth to transition its EHR routing relationships to Surescripts directly.

136. First, Surescripts provided additional financial incentives to RelayHealth to remain exclusive in routing, including by changing the definition of RelayHealth's "loyalty" to Surescripts from a customer-by-customer basis to a platform-wide basis.

137. Second, Surescripts forced RelayHealth to terminate its routing relationships with EHR system providers. RelayHealth, through its reseller arrangement with Surescripts, had

---

[38] *Id.* at ¶150.

[39] *Id.*

[40] *Id.*

[41] *Id.*

connections to both the pharmacy and the EHR sides of the routing network. Surescripts executives knew that EHR system providers were the "gatekeepers" to prescribers. A link to the EHR side is necessary to operate a two-sided routing network, meaning that this termination would prevent RelayHealth from being a competitive threat in routing. In exchange for removing the explicit non-compete provision from the contract, Surescripts required RelayHealth to terminate its EHR system provider connections for routing and transition those relationships directly to Surescripts. RelayHealth agreed, hoping that removing Surescripts's control over its relationship with these customers would allow RelayHealth to collaborate directly with EHR system providers on innovative value-added services.

138.    Surescripts executives understood that the 2015 contract continued to prevent RelayHealth from entering the routing market despite the removal of the explicit non-compete provision. On February 4, 2015, shortly after the 2015 contract was executed, Surescripts's Chief Quality Officer emailed Surescripts's Vice President of Customer Accounts: "[C]ongratulations. This is a hugely important deal for us, cementing our position for at least several more years. I would not want to have Relay out there competing directly against us."[42]

139.    An internal Surescripts competition analysis from that time characterized RelayHealth as a "Core Systemic [Competitor]," a "Direct Competitor to Core E-Prescribing Network," and a company that is "[a]lways one to watch since they have the assets and know-how to be a threat." However, that same document continued, "[Surescripts] has done an exceptional job removing them as EHR aggregator" when assessing the competitive threat RelayHealth posed to Surescripts in routing.[43]

---

[42] *Id.* at ¶154.

[43] *Id.* at ¶155.

140.     As of today, RelayHealth has not entered the routing market.

## VI.  SURESCRIPTS POSSESSES MONOPOLY POWER IN EACH RELEVANT MARKET

### A.     The relevant markets.

141.     There are two relevant product markets: (1) routing transactions and (2) eligibility transactions.

142.     Other means of transmitting routing and eligibility information (*e.g.*, paper, phone, fax) are not reasonably interchangeable with electronic prescribing because of safety concerns and greater efficiencies associated with electronic prescriptions, as well as the requirements of MIPPA, the HITECH Act, and BITS regulations.

143.     The relevant geographic market is the United States. Large pharmacy chains, EHR system providers, and PBMs that make up nearly all of routing and eligibility transactions have nationwide reach. Surescripts's customers enter into contracts with nationwide reach, and prices and contract terms are set at a national level. Federal laws and regulations that govern e-prescribing i.e., MIPPA, HITECH, and associated CMS regulations, operate on a national level, further supporting a national geographic market.

144.     Thus, the relevant markets in which to evaluate Surescripts's conduct are (1) routing transactions in the United States and (2) eligibility transactions in the United States.

### B.     Surescripts possesses monopoly power in the relevant markets.

145.     Surescripts possesses monopoly power in each relevant market.

146.     Surescripts has possessed monopoly power in each relevant market from 2009 to present.

147.     There is substantial direct evidence that Surescripts possesses monopoly power.

148. Direct evidence of Surescripts's monopoly power includes its demonstrated ability to control price in each relevant market.

149. Surescripts has the ability to price substantially higher than its competitors in the routing market without losing customers. This includes both prices to pharmacies and incentives to EHR system providers.

150. Surescripts has the ability to price substantially higher than its competitors in the eligibility market without losing customers. This includes pricing to PBMs and incentives to EHR system providers.

151. Other direct evidence of Surescripts's market power includes the lack of any meaningful competition in either routing or eligibility from 2009 to the present. For example, when Surescripts refused to do business with a customer called PrescribersConnection in 2015, that customer was left with nowhere else to turn and has had its e-prescribing functionality permanently disabled—a situation that persists today. Surescripts's customers agree that there are "no 1-1 alternatives to Surescripts," that Surescripts is a "must-have" network and a "monopolist for a key service."[44]

152. There is substantial indirect evidence that Surescripts possesses monopoly power.

153. Surescripts possesses extremely high market shares in both relevant markets. Surescripts possesses at least 95% market shares (by transaction volume) in both the market for routing and the market for eligibility. As one Surescripts vice president put it in 2015, "We are a Monopoly when it comes [to] Prescription Routing."[45] Even if routing and eligibility were to be considered part of the same market, Surescripts's own then-Executive Vice President and Chief

---

[44] *Id.* at ¶167.

[45] *Id.* at ¶169.

Customer Officer stated in testimony provided in FTC's complaint that Surescripts's market share in both products is "[l]ikely north of 90 percent."[46]

154.    The markets for routing and eligibility are characterized by barriers to entry in the form of the chicken-and-egg problem, which Surescripts's conduct has rendered unsurmountable.

## VII.    ANTITRUST IMPACT

155.    Surescripts's anticompetitive course of conduct has resulted in the total exclusion of any meaningful competition in e-prescribing, repeated threats to customers to force exclusivity, higher prices, reduced innovation, and lower output.

### A.    Surescripts's conduct forecloses each market from all meaningful competition.

156.    Surescripts, whether directly or indirectly via RelayHealth, successfully imposed loyalty requirements on nearly all of its pharmacy and PTV customers. By January 2011, Surescripts had loyalty contracts with at least 78% of the pharmacy side of the routing market (by transaction volume), including contracts with major pharmacies such as CVS, Walgreens, Walmart, and Rite Aid. Nearly all of the loyalty contracts with these pharmacies have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts, whether directly or indirectly via RelayHealth, has loyalty contracts with at least 79% of pharmacy routing transaction volume. These contracts therefore foreclose nearly 80% of the pharmacy side of the routing network from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem unsurmountable for Surescripts's competitors.

---

[46] *Id.*

157.    Surescripts also imposed loyalty requirements on nearly all of its PBM customers. By October 2011, Surescripts had exclusivity contracts with at least 74% of the PBM side of the eligibility market (by transaction volume), including contracts with major PBMs such as Express Scripts, CVS, and Medco. Nearly all of the loyalty contracts with these PBMs have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts has exclusivity contracts with at least 78% of PBM eligibility transaction volume. These contracts therefore foreclose nearly 80% of the PBM side of the eligibility network from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem unsurmountable for competitors.

158.    Surescripts, whether directly or indirectly via RelayHealth, also imposed loyalty requirements on nearly all of its EHR system provider customers. By November 2010, Surescripts had exclusivity contracts with at least 81% of the EHR routing market and at least 78% of the EHR eligibility market (both measured by transaction volume), including contracts with major EHR system providers such as Allscripts, Epic, and eClinicalWorks. Nearly all of the loyalty contracts with these entities have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts—which in 2015 took direct control over nearly all of RelayHealth's routing contracts with EHR system providers have loyalty contracts with at least 87% of EHR routing and eligibility transaction volume. These contracts therefore foreclose well over 80% of the EHR sides of the routing and eligibility networks from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem unsurmountable for competitors.

159.     The above foreclosure percentages likely understate the foreclosure effects of Surescripts's conduct, which is based on contracts for Surescripts's largest routing and eligibility customers. There is a "long tail" of smaller Surescripts customers that are also foreclosed by the same loyalty contracts described above, which only further increases the percentage of each side of each market that Surescripts has been able to foreclose.

160.     Surescripts's loyalty contracts disrupt competition in routing and eligibility. Because Surescripts has foreclosed at least 70-80% of each of the routing and eligibility markets, even when a competitor offers lower per-transaction prices, no customer will do business with that competitor because that competitor cannot lower the customer's total e-prescribing cost. Because of Surescripts's conduct, no competitor can gain enough scale to solve the chicken-and-egg problem and compete with Surescripts. Customers, including PBMs, EHR system providers, and pharmacies, are all harmed by not having any choice of routing or eligibility provider.

161.     A pharmacy would sign up with a Surescripts competitor—and thus incur non-loyalty penalties via higher prices or clawbacks—only if the competitor could route enough prescriptions from EHR system providers that are priced low enough to create sufficient savings to offset the pharmacy's losses from the foregone Surescripts discounts. Likewise, an EHR system provider would sign up with a Surescripts competitor—and thus incur non-loyalty penalties via eliminated incentive payments or clawbacks—only if the competitor could pay the EHR system provider high enough incentives on a sufficient number of transactions to offset that firm's losses from the foregone Surescripts payments. This same logic applies to PBMs and EHR system providers for eligibility.

162.     Surescripts's loyalty regime ensures that no customer could ever attain a lower *total* cost by multihoming, even if Emdeon or some other competitor offered that customer, in

the words of one of Surescripts's former vice presidents, "some phenomenally low amount" on the transactions sent through Emdeon's network.

163.    Pharmacies and PBMs receive discounts from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince a pharmacy or PBM to multihome would need to offer a lower price to compensate that customer for losing its loyalty discount with Surescripts. Due to the limited connections to EHR system providers that a competing platform could offer, the compensating price would have to be *negative,* meaning the competing platform would have to *pay* pharmacies and PBMs for each routing and eligibility transaction.

164.    Similarly, EHR system providers receive incentive fees from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince an EHR system provider to multihome would need to offer higher incentive fees to compensate that customer for losing its incentive fees from Surescripts. Due to the limited connections to pharmacies and PBMs that a competing platform could offer, the compensating incentive fees would be unprofitable for an equally efficient competitor.

165.    By foreclosing approximately 80% of both markets and making the chicken-and-egg problem unsurmountable, Surescripts has ensured that no other competitor can be or remain viable in either routing or eligibility, or both.

**B.    Surescripts forces its routing and eligibility customers into exclusivity.**

166.    Many pharmacy, PBM, and EHR system provider customers that have entered into loyalty contracts with Surescripts would prefer the option of having a competing network for routing and eligibility. However, because these pharmacies, PBMs, and EHR system providers compete with other pharmacies, PBMs, and EHR system providers, they cannot absorb higher e-

prescribing costs and remain competitive. Thus, Surescripts's customers lack the realistic ability to refuse Surescripts's loyalty requirements or pricing.

167.    As one Surescripts customer, an EHR system provider, explained, despite "strongly object[ing] to the . . . exclusivity provisions" in Surescripts's contract, it had no choice but to agree to Surescripts's exclusivity provision "[b]ecause there were no alternative providers that could meet all of its needs." Though the customer recognized "that the inclusion of the exclusivity provisions provided Surescripts with the ability to protect its dominance in the e-prescribing market place," the customer had "to enter into a contract that included those provisions if [it] wanted to enter into e-prescribing."[47]

168.    Another Surescripts customer similarly feared that "Surescripts would have cut us off" if that customer did not sign an exclusive agreement with Surescripts.[48]

169.    Surescripts today no longer competes on the merits, but instead relies on its size, its ability to force customers into exclusivity, and the success of its loyalty program to maintain its monopolies.

### C.    Surescripts's conduct has led to higher net prices for routing and eligibility.

170.    But for Surescripts's anticompetitive course of conduct, the net price (taking into account both sides of the network) of the routing transaction would be lower, as would the net price (taking into account both sides of the network) of the eligibility transaction.

171.    Consequently, Surescripts's actions have increased the prices Plaintiff and class members have paid for routing transactions.

---

[47] *Id.* at ¶183.

[48] *Id.* at ¶184.

172. Economics recognizes that an overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.[49] Professor Hovenkamp also instructs that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[50] Here, PTVs passed on the inflated prices of routing to Plaintiff and class members.

173. The handful of instances where a single customer uses both the Surescripts network and the Emdeon network shows that Emdeon is able to provide lower per-transaction prices or higher per-transaction incentives.

174. For example, Kroger uses both Emdeon and Surescripts via RelayHealth for routing. Emdeon charges Kroger pharmacies per-transaction prices that are lower than Surescripts's prices. Similarly, Emdeon has sold the routing transaction to one PTV customer, Rx30, at a lower per-transaction price than Surescripts's per-transaction price, and has offered to sell to another PTV customer, QS/1, at a lower per-transaction price than Surescripts charges.

175. On the EHR system provider side, Surescripts understood and acknowledged its ability to price above the competitive level. In an email exchange concerning EHR system provider eClinicalWorks's attempts to negotiate for higher incentive payments, one Surescripts executive explained to another that "[eClinicalWorks's] position in negotiating for more and more $$ only seems relevant when there are at least 5 more 'Surescripts' from which to choose. Today there is just one Surescripts."

---

[49] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[50] *Id.*

176.    Emdeon was willing to pay higher incentives to EHR system providers. For example, in 2010 Emdeon paid Allscripts incentives that were higher than what Surescripts and RelayHealth paid Allscripts. And Emdeon continued to pay Allscripts incentives that were higher than the incentives that Surescripts paid until Allscripts disconnected from Emdeon in June 2013.

177.    Because the loyalty contracts limited competitors' expansion, and thereby reduced pharmacies', PBMs', and EHR system providers' leverage with Surescripts, the contracts have enabled Surescripts, free from competitive discipline, to continue to demand higher prices from customers.

178.    For example, in April 2012, Surescripts increased transaction prices (by decreasing incentive payments) for all of its EHR system provider customers for both routing and eligibility. In contemporaneous documents, Surescripts recognized that it was able to use its monopoly power to take money away from its EHR system provider customers by decreasing these incentive payments. Indeed, none of Surescripts's EHR system provider customers were able to avoid these incentive payment reductions. And no EHR system provider customer moved its business to a Surescripts competitor or refused to do business with Surescripts as a result of this price increase.

179.    As another example, in July 2013, Surescripts analyzed the impact of Allscripts's June 20, 2013 termination of its relationship with Emdeon, which Surescripts required Allscripts to do in the 2010 Surescripts-Allscripts agreement. In a presentation that was circulated and commented on by senior Surescripts executives, Surescripts concluded that, because Allscripts had to stop using the cheaper Emdeon network and now had to route its volume through the more expensive Surescripts network, those few pharmacy customers that were not loyal to

Surescripts were "feeling economic pain" and "paying 'more at the pump.'" This same presentation calculated exactly how much "economic pain" its pharmacy customers such as Kroger were experiencing: because Kroger no longer got its Allscripts prescriptions at Emdeon's per-transaction rate, but now had to pay Surescripts's higher per transaction rate, Kroger's annual routing costs increased. Kroger documented that the result of being forced to pay Surescripts's higher prices meant that its routing costs "increased significantly," by approximately 25%.[51]

**D. Surescripts's conduct has reduced innovation in routing and eligibility.**

180.     Surescripts's dominance over routing and eligibility has allowed it to control the rate of innovation, or lack thereof. A lack of competitive discipline and customers' inability to change e-prescribing vendors has led to reduced innovation in e-prescribing. In testimony quoted in FTC's complaint, a RelayHealth senior executive stated: "I can tell that in general that the industry wants e-prescribing to evolve, and it's not."[52]

181.     Surescripts agrees. As Surescripts's former Chief Strategy Officer said in testimony quoted in FTC's complaint, from the time he joined Surescripts until when he left in 2012, he "saw a bloated organization that wasn't lowering cost, not delivering where people would feel like they were true customers."[53] A January 2013 Surescripts presentation forwarded to Surescripts's Executive Vice President and Chief Customer Officer summarized the issue aptly: "There's a 'we've got such a dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude."[54]

---

[51] Redacted Complaint at ¶195, *FTC v. Surescripts, LLC*, No. 1:19-cv-01080, (D.D.C. May 3, 2019) (ECF 26).

[52] *Id.* at ¶196.

[53] *Id.* at ¶197.

[54] *Id.*

182.    Surescripts's agreements with RelayHealth provide examples of how, in RelayHealth's words, "[t]he current [RelayHealth] relationship with [Surescripts] . . . inhibits innovation."[55]

183.    Significantly, this innovation would have occurred in not just the routing market but also in the eligibility market. Because of Surescripts's conduct, however, consumers have had to wait many years to receive the benefits of such innovation, if consumers ever received those benefits at all.

184.    For example, the 2010 Surescripts-RelayHealth contract called for the two companies to co-develop an initial list of 27 different value-added services, including Adherence Monitoring, Prescription History to Hospitals, Print @ Patient Cell Phone, Rx Claim Pre-Adjudication, Real-Time Benefit Check, electronic Prior Authentication, and REMS-related services such as prohibiting the prescribing/dispensing of medications with Risk Evaluation and Mitigation Strategies.

185.    Not one joint Surescripts-RelayHealth value-added product or service resulted from the 2010 contract.

186.    Similarly, not one joint Surescripts-RelayHealth product or service has resulted from the 2015 contract.

187.    As alleged above, Surescripts repeatedly described the sole value of its agreements with RelayHealth as keeping RelayHealth's customers exclusive to Surescripts and preventing RelayHealth from competing against Surescripts in routing.

188.    On numerous occasions, RelayHealth unsuccessfully attempted to collaborate with Surescripts to develop these value-added services. One RelayHealth executive testified that

---

[55] *Id.* at ¶198.

Surescripts proved to be "not very innovative or cooperative when it comes to value-added services" and that Surescripts's "words were much rosier than their actions, and [RelayHealth] presented many solutions from a value-add perspective, and they seemed to fall on deaf ears, and they were not pursued." The failure of Surescripts and RelayHealth to collaborate "wasn't for a lack of trying on [RelayHealth's] part." Surescripts never provided an explanation to RelayHealth as to why Surescripts chose not to collaborate with RelayHealth on any value-added services listed in the 2010 contract.

189. For example, the 2010 contract called for Surescripts and RelayHealth to co-develop a real-time benefit check service that would represent a significant improvement over Surescripts's existing eligibility service. Unlike Surescripts's eligibility offering, which relied on non-patient-specific, static formulary information, real-time benefit check allows a PBM to transmit patient-specific, real-time formulary information to physicians. Surescripts has known how to transmit such real-time formulary information since 2005, and RelayHealth expected to co-develop this service after the signing of the 2010 contract. Indeed, RelayHealth brought up this and other value-added services proposals at quarterly business meetings with Surescripts from 2012 to 2014. Surescripts never engaged with RelayHealth in developing real-time benefit check. Surescripts never shared any confidential or proprietary data, information, or technology with RelayHealth concerning real-time benefit check or other value-added services.

190. Only once RelayHealth understood that Surescripts had no intention to collaborate did RelayHealth develop value-added services such as real-time benefit check on its own. As early as 2013, RelayHealth began efforts to develop a real-time benefit check solution by itself, which RelayHealth brought to market in 2017. At that point, facing competition from RelayHealth, Surescripts finally brought its own real-time benefit check service to market.

191.    The harms from Surescripts's conduct with respect to RelayHealth continue through today. The 2015 Surescripts-RelayHealth agreement, which is currently in effect, contains an implicit non-compete that prevents RelayHealth from competing against Surescripts in routing.

192.    Had Surescripts not completely excluded all competition from the relevant markets—whether it was Emdeon, RelayHealth, Allscripts, or otherwise—competitive forces would have spurred Surescripts to innovate faster, bringing (or trying to bring) services such as real-time benefit check to the market earlier. Consumers were harmed as a result of these significant innovation delays.

**E.      Surescripts's conduct has reduced quality in routing and eligibility.**

193.    Similarly, because Surescripts faces no competition, it also has no incentive to improve its services, resulting in reduced quality to its customers, as Surescripts admitted: "[b]ecause we didn't grow up in a competitive environment and we grew up as a monopoly, we don't have the best way of dealing with customers."[56]

194.    Customers agree. They have echoed these critiques, complaining that Surescripts has poor customer service, is slow to innovate, impedes its EHR system provider customers' ability to innovate due to stringent certification requirements, and uses opaque pricing strategies. Surescripts's own executives report that customers use the following words to describe Surescripts: "monopoly," "entrenched," "slow," "difficult," "misleading," "challenging," "inconsistent," and "dictates."[57]

---

[56] *Id.* at ¶209.

[57] *Id.* at ¶210.

195.    To take one example, as early as January 2011 Surescripts knew that many of its pharmacy customers were dissatisfied with Surescripts's service surrounding a specific type of routing transaction called "Denied, NewRx to Follow" or "DNTF," which small, independent pharmacies believed caused Surescripts to double-bill the pharmacies for a single transaction. Surescripts, however, did not change its practices on DNTF until April 2013, 27 months after Surescripts's senior executives knew that Surescripts was double-billing its routing customers.

196.    Had Surescripts's anticompetitive conduct not allowed it to maintain its monopoly status, consumers would have been able to choose other options that could have provided better customer service, or at least provided a competitive threat to spur Surescripts to improve the quality of its own services. But because Surescripts has unlawfully maintained its monopolies through its exclusive dealing and other anticompetitive arrangements with RelayHealth and Allscripts, consumers have been denied the quality improvements that competition brings.

### F.    Surescripts's conduct has reduced overall transaction output.

197.    Surescripts's conduct has also reduced output as measured by transaction volume. As of 2017, 69% of doctors were utilizing e-prescribing. But for Surescripts's conduct, competition for physicians (via their EHR system providers) would likely result in higher incentive payments to EHR system providers, which would in turn provide incentives to EHR system providers to increase their doctors' utilization of e-prescribing. At least one EHR system provider welcomed the idea of higher incentives tied to growth: "we would welcome an additional 'target' level whereby the incentive would increase . . . as the volume grows." And Allscripts told Surescripts that higher incentives tied to volume instead of loyalty would allow it to commit "to an increase in electronic prescription transactions from all our products through the Surescripts network." Surescripts, however, rejected these options in favor of contractual language that implemented its loyalty scheme.

198.    Additionally, Surescripts's stringent certification requirements have delayed adoption and utilization of e-prescribing. Absent the restraints, increased price, innovation, and quality competition among networks for EHR system providers would likely further incentivize or enable EHR system providers to increase the utilization of e-prescribing among doctors.

**G.    There is no legitimate procompetitive business justification for Surescripts's conduct.**

199.    As the Senior Vice President of one of Surescripts's large hospital system customers wrote in a March 2, 2011 letter to Surescripts's CEO expressing his "deep concern" about Surescripts's exclusivity requirements: "There is no conceivable justification for this policy other than Surescripts's desire to maintain an e-prescribing monopoly."[58]

200.    Surescripts's exclusivity requirements do not serve any legitimate procompetitive business purpose. Increases in adoption and utilization were largely driven by incentives under MIPPA, the HITECH Act, and a broader movement towards computerized health records generally. While incentive payments to EHR system providers may increase output, the exclusivity provisions to which those incentives are tied do not enhance or otherwise further the adoption or utilization of e-prescribing.

201.    Surescripts's exclusivity requirements were not reasonably necessary to reduce prices. Moreover, Surescripts could have accomplished this objective through less restrictive alternatives, primarily through discounts based on volume, not loyalty.

202.    Surescripts is not a natural monopoly. E-prescribing customers treat Surescripts like any other vendor, seeking out alternatives to Surescripts for routing and eligibility. A small

---

[58] *Id.* at ¶216.

number of customers use multiple networks. At least one smaller-scale competitor, Emdeon, has offered lower pricing and higher incentive payments.

203.     There is no legitimate procompetitive justification for the features in Surescripts's contracts with Allscripts. Indeed, though it was only after Surescripts and Allscripts became aware of the FTC's investigation, Surescripts and Allscripts dropped many of these provisions, yet Surescripts is still able to provide routing and eligibility services to Allscripts today.

204.     There is no legitimate procompetitive justification for Surescripts's routing non-compete with RelayHealth. Other provisions in the 2010 contract provided strong protections for any of Surescripts's proprietary information. Any proprietary information disclosed by either party to the other in connection with the agreement was protected by the recipient party from disclosure to others. Any documentation provided by Surescripts under the 2010 contract was designated proprietary to Surescripts, and RelayHealth could not copy or use that documentation in any way other than as specifically authorized by the agreement.

## VIII.   EFFECT ON INTERSTATE COMMERCE

205.     During the relevant time period, Surescripts sold e-prescription routing and eligibility in an uninterrupted flow of interstate commerce.

206.     During the relevant time period, Plaintiff and class members paid for routing. As a result of Surescripts's illegal conduct, Plaintiff and class members paid artificially inflated prices for routing.

207.     Surescripts engaged in illegal activities, as charged in herein, within the flow of, and substantially affecting, interstate commerce, including in this district.

## IX.    PLAINTIFF'S CLAIMS ARE TIMELY.

### A.    Surescripts concealed its unlawful scheme.

208.    Due to Surescripts's fraudulent concealment of its unlawful conduct, Plaintiff and class members are entitled to recover damages reaching back beyond four years before the filing of this Complaint. Plaintiff and class members had no knowledge of Surescripts's unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence until April 24, 2019 when FTC's complaint against Surescripts was unsealed.

209.    Surescripts's scheme was self-concealing, and it employed deceptive tactics and techniques of secrecy to avoid detection of, and to fraudulently conceal, its contract, combination, conspiracy, and scheme.

210.    As a result of Surescripts's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's claims have been tolled.

### B.    Surescripts's actions are a continuing violation.

211.    In the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Plaintiff and class members are entitled to recover damages they suffered during the limitations period.

212.    A claim accrued for Plaintiff each time Plaintiff paid artificially inflated prices for routing made possible by Surescripts's anticompetitive conduct. And each payment at a supra-competitive price constituted another overt act in furtherance of Surescripts's continuing anticompetitive scheme.

## X.     CLASS ALLEGATIONS

213.    Plaintiff brings this action under Federal Rules of Civil Procedure 23(a) and (b)(2)

as a representative of a class seeking injunctive relief ("Injunctive Relief Class") defined as

follows:

> All pharmacies in the United States and its territories who indirectly purchased or
> paid for e-prescription routing transactions from Surescripts beginning at least as
> early as January 1, 2010 until the effects of Surescripts's conduct cease ("Class
> Period").

214.    Plaintiff also brings this action under Federal Rules of Civil Procedure 23(a) and

(b)(3) as a representative of a class seeking damages ("Damages Class") defined as follows:

> All pharmacies who indirectly purchased or paid for e-prescription routing
> transactions from Surescripts during the Class Period in the District of Columbia,
> Puerto Rico, or any of the following states and commonwealths: Alabama, Alaska,
> Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia,
> Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,
> Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska,
> Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,
> North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina,
> South Dakota, Texas, Tennessee, Utah, Vermont, Virginia, Washington, West
> Virginia, Wisconsin, or Wyoming.

215.    The following persons and entities are excluded from the Injunctive Relief Class

and the Damages Class (together, the "classes"):

(a)    Surescripts and its counsel, officers, directors, management, employees,

subsidiaries, or affiliates;

(b)    All governmental entities;

(c)    All Counsel of Record; and

(d)    The Court, Court personnel, and any member of their immediate families.

216.    The members of each class are so numerous that joinder is impracticable. Each

class includes at least thousands of members. Members of the classes are widely dispersed

throughout the country.

217.    Plaintiff's claims are typical of the claims of all class members. Plaintiff's claims arise out of the same common course of conduct that gives rise to the claims of the other class members. Plaintiff and all class members were and will continue to be damaged by the same wrongful conduct, *i.e.*, they paid artificially inflated prices for e-prescription routing and were deprived of earlier and more robust competition from potential competitors as a result of Surescripts's wrongful conduct.

218.    Plaintiff will fairly and adequately protect and represent the interests of the classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the classes.

219.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise in class action antitrust litigation in the healthcare industry.

220.    Questions of law and fact common to the classes include:

(a)     Whether Surescripts unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

(b)     Whether there exist any legitimate procompetitive reasons for some or all of Surescripts's conduct;

(c)     To the extent any such procompetitive benefits exist, whether there were less restrictive means of achieving them;

(d)     Whether there was an illegal agreement between Surescripts and RelayHealth to not compete and to allocate the routing market to Surescripts;

(e)     Whether there was an illegal agreement between Surescripts and Allscripts to eliminate competition in the routing market;

(f)    Whether Surescripts's scheme, in whole or in part, has substantially affected interstate commerce;

(g)    Whether Surescripts's anticompetitive conduct caused antitrust injury through overcharges to the business or property of Plaintiffs and the Class members; and

(h)    The quantum of aggregate overcharge damages to the Damages Class.

221.    Questions of law and fact common to the Damages Class members predominate over any questions that may affect only individual class members, because Surescripts has acted on grounds generally applicable to the entire Damages Class.

222.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

223.    Class treatment also is appropriate under Rule 23(b)(2). The prosecution of separate actions by individual members of the Injunctive Relief Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Surescripts. In addition, the prosecution of separate actions by individual members of the Injunctive Relief Class would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other class members not parties to such adjudications or would substantially impair or impede other class members' ability to protect

their interests. Lastly, Surescripts has acted and refused to act on grounds that apply generally to the Injunctive Relief Class such that final injunctive relief and/or declaratory relief is warranted with respect to the class as a whole.

224.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 2 of the Sherman Act: Monopolization
### (On Behalf of the Injunctive Class)

225.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

226.    Surescripts has, at all relevant times had, monopoly power in the markets for prescription routing in the United States.

227.    Since at least as early as September 2010, Surescripts has engaged in various activities to willfully maintain its monopoly power through its course of anticompetitive conduct, including its exclusive or de facto exclusive agreements with pharmacies, PTVs, and EHR system providers, requiring those entities to use the Surescripts network exclusively or nearly exclusively for routing, as well as the non-compete provisions in its contracts with RelayHealth. Collectively, Surescripts's contracts substantially foreclose the routing market from actual and potential competition. Through its course of conduct, Surescripts has excluded competition and willfully maintained its monopoly in routing by not competing on the merits.

228.    There is no valid procompetitive justification for Surescripts's exclusionary conduct in the routing market.

229.     Plaintiff and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for routing transactions, if Surescripts's unlawful conduct is not enjoined.

230.     Plaintiff and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Surescripts's unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II
## Violation of State Law: Monopolization
## (On Behalf of the Damages Class)

231.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

232.     Surescripts's monopolistic conduct violates the following state antitrust laws:

(a)     Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by Damages Class members.

(b)     Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by Damages Class members.

(c)     C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases in Connecticut by Damages Class members.

(d)     D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in D.C. by Damages Class members.

(e)     Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*, with respect to purchases in Hawaii by Damages Class members.

(f)     740 Ill. Comp. Stat. §§ 10/3, *et seq*., with respect to purchases in Illinois by Damages Class members.

(g)     Iowa Code §§ 553.5, *et seq.*, with respect to purchases in Iowa by Damages Class members.

(h)     Kan. Stat. Ann. §§ 50-112, *et seq.*, with respect to purchases in Kansas by Damages Class members.

(i)     Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*, with respect to purchases in Maine by Damages Class members.

(j)     MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases in Maryland by Damages Class members.

(k)     Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by Damages Class members.

(l)     Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases in Minnesota by Damages Class members.

(m)     Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by Damages Class members.

(n)     Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by Damages Class members.

(o)     Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by Damages Class members.

(p)     N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*, with respect to purchases in New Hampshire by Damages Class members.

(q)  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by Damages Class members.

(r)  N.Y. Gen. Bus. Law § 340 with respect to purchases in New York by Damages Class members.

(s)  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by Damages Class members.

(t)  N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by Damages Class members.

(u)  Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases in Oregon by Damages Class members.

(v)  R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases in Rhode Island by Damages Class members.

(w)  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by Damages Class members.

(x)  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by Damages Class members.

(y)  Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases by Utah residents in the Damages Class.

(z)  Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by Damages Class members.

(aa)  W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by Damages Class members.

(bb)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by Damages Class members.

233.    Surescripts's conduct also violates Florida's Deceptive & Unfair Trade Practices Act (Fla. Stat. §§ 501.201, et seq.), which prohibits "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Surescripts's conduct in restraining competition and maintaining its monopoly, as alleged in this Complaint, constitutes unfair methods of competition and/or unconscionable or unfair acts or practices. Surescript's unlawful conduct caused Damages Class members located in Florida to suffer injury in the form of overcharges for routing transactions.

234.    Plaintiff and Damages Class members have been injured in their business or property by reason of Surescripts's violations of the laws set forth above, in that Plaintiff and Damages Class members paid, and are continuing to pay, higher prices for routing transactions than they would have paid but for the unlawful conduct. These injuries are of the type that the above laws were designed to prevent, and flow from that which makes the conduct unlawful.

235.    Plaintiff and Damages Class members accordingly seek damages and multiple damages as permitted by law.

### COUNT  III
### Unjust Enrichment
### (On Behalf of the Damages Class)

236.    Plaintiff incorporates by reference the preceding allegations.

237.    To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

238.    Surescripts has financially benefited from the overcharges on every routing transaction, which resulted from the unlawful and inequitable acts alleged in this Complaint. These overcharges were borne by Plaintiff and members of the Damages Class who paid for

routing. The benefits conferred upon Surescripts are substantial and measurable, in that the revenues Surescripts earned due to unlawful overcharges are ascertainable by review of sales records.

239.    There is gross disparity between the price that Plaintiff and members of the Damages Class paid for routing compared to what they would have paid but for Surescripts's unlawful and inequitable conduct.

240.    Surescripts repeatedly and continuously received financial benefits at the expense of Plaintiff and members of the Damages Class by charging inflated prices for routing.

241.    It would be futile for Plaintiff and members of the Damages Class to seek a remedy from any party with whom they had or have privity of contract. Surescripts has paid no consideration to any other person for any of the benefits they received indirectly from Plaintiff and members of the Damages Class.

242.    It would be futile for Plaintiff and members of the Damages Class to seek to exhaust any remedy against the immediate intermediary from which they indirectly purchased routing, as those intermediaries cannot reasonably be expected to compensate Plaintiff and members of the Damages Class for Surescripts's unlawful conduct.

243.    The financial benefits that Surescripts derived rightfully belong to Plaintiff and members of the Damages Class, which paid anticompetitive prices that inured to Surescripts's benefit.

244.    It would be inequitable under the unjust enrichment principles of the states listed below for Surescripts to retain any of the overcharges that Plaintiff and members of the Damages Class paid for routing, which were derived from Surescripts's anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

245.    Surescripts should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiff and members of the Damages Class.

246.    A constructive trust should be imposed upon all unlawful or inequitable sums Surescripts received, which arise from overpayments for routing by Plaintiff and members of the Damages Class.

247.    Plaintiff and members of the Damages Class have no adequate remedy at law.

248.    By engaging in the foregoing unlawful or inequitable conduct, Surescripts has been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

### Alabama

249.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Alabama at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Alaska

250.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Alaska at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Arizona

251.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Arizona at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for routing. The Damages Class has been impoverished by the overcharges for routing resulting from Surescripts's unlawful conduct. Surescripts's enrichment and the Damages Class's impoverishment are connected. There is no justification for Surescripts's receipt of the benefits causing its enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Surescripts's benefit, and it would be inequitable for Surescripts to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

## Arkansas

252.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Arkansas at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**California**

253.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in California at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Colorado**

254.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Colorado at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Connecticut**

255.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Connecticut at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Delaware

256.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Delaware at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for routing. The Damages Class has been impoverished by the overcharges for routing resulting from Surescripts's unlawful conduct. Surescripts's enrichment and the Damages Class's impoverishment are connected. There is no justification for Surescripts's receipt of the benefits causing its enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Surescripts's benefit, and it would be inequitable for Surescripts to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

## District of Columbia

257.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in the District of Columbia at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Florida**

258.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Florida at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Georgia**

259.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Georgia at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Hawaii**

260.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Hawaii at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages
Class.

## Idaho

261.    Surescripts unlawfully overcharged members of the Damages Class, who paid for
routing in Idaho at prices that were more than they would have been but for Surescripts's actions.
Surescripts received money from the Damages Class as a direct result of the unlawful
overcharges and have retained this money. Surescripts has benefitted at the expense of the
Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable
for Surescripts to accept and retain the benefits received without compensating the Damages
Class.

## Illinois

262.    Surescripts unlawfully overcharged members of the Damages Class, who paid for
routing in Illinois at prices that were more than they would have been but for Surescripts's
actions. Surescripts received money from the Damages Class as a direct result of the unlawful
overcharges and have retained this money. Surescripts has benefitted at the expense of the
Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable
for Surescripts to accept and retain the benefits received without compensating the Damages
Class.

## Iowa

263.    Surescripts unlawfully overcharged members of the Damages Class, who paid for
routing in Iowa at prices that were more than they would have been but for Surescripts's actions.
Surescripts received money from the Damages Class as a direct result of the unlawful
overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Kansas

264.　Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Kansas at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Kentucky

265.　Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Kentucky at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Louisiana

266.　Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Louisiana at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for

routing. The Damages Class has been impoverished by the overcharges for routing resulting from Surescripts's unlawful conduct. Surescripts's enrichment and the Damages Class's impoverishment are connected. There is no justification for Surescripts's receipt of the benefits causing its enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Surescripts's benefit, and it would be inequitable for Surescripts to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Maine**

267.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Maine at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Maryland**

268.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Maryland at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Massachusetts

269.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Massachusetts at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Michigan

270.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Michigan at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Minnesota

271.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Minnesota at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Mississippi

272. Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Mississippi at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Missouri

273. Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Missouri at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Montana

274. Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Montana at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Nebraska

275.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Nebraska at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Nevada

276.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Nevada at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### New Hampshire

277.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in New Hampshire at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of

the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### New Jersey

278.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in New Jersey at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### New Mexico

279.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in New Mexico at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### New York

280.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in New York at prices that were more than they would have been but for Surescripts's

actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## North Carolina

281.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in North Carolina at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## North Dakota

282.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in North Dakota at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for routing. The Damages Class has been impoverished by the overcharges for routing resulting from Surescripts's unlawful conduct. Surescripts's enrichment and the Damages Class's impoverishment are connected. There is no justification for Surescripts's receipt of the benefits causing its enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Surescripts's benefit, and it would be inequitable for

Surescripts to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

## Oklahoma

283.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Oklahoma at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Oregon

284.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Oregon at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Pennsylvania

285.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Pennsylvania at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Puerto Rico

286.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Puerto Rico at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for routing. The Damages Class has been impoverished by the overcharges for routing resulting from Surescripts's unlawful conduct. Surescripts's enrichment and the Damages Class's impoverishment are connected. There is no justification for Surescripts's receipt of the benefits causing its enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Surescripts's benefit, and it would be inequitable for Surescripts to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

## Rhode Island

287.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Rhode Island at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## South Carolina

288.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in South Carolina at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## South Dakota

289.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in South Dakota at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## Tennessee

290.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Tennessee at prices that were more than they would have been but for Surescripts's actions. Surescripts has been enriched by revenue resulting from unlawful overcharges for routing. Surescripts appreciated the benefit bestowed upon it by the Damages Class. Under the circumstances, it would be inequitable for Surescripts to retain such benefits without compensating the Damages Class. It would be futile for the Damages Class to seek a remedy from any party with whom they have privity of contract. Surescripts has paid no consideration to

any other person for any of the unlawful benefits they received indirectly from the Damages

Class with respect to fees from routing. It would be futile for the Damages Class to exhaust all

remedies against the entities with which the Damages Class has privity of contract because the

Damages Class did not directly pay Surescripts for routing.

**Texas**

291.     Surescripts unlawfully overcharged members of the Damages Class, who paid for

routing in Texas at prices that were more than they would have been but for Surescripts's

actions. Surescripts received money from the Damages Class as a direct result of the unlawful

overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages

Class. Surescripts was aware of or appreciated the benefit bestowed upon them by the Damages

Class. The Damages Class has no remedy at law.

**Utah**

292.     Surescripts unlawfully overcharged members of the Damages Class, who paid for

routing in Utah at prices that were more than they would have been but for Surescripts's actions.

Surescripts received money from the Damages Class as a direct result of the unlawful

overcharges and have retained this money. Surescripts has benefitted at the expense of the

Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages

Class.

**Vermont**

293.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Vermont at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Virginia

294.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Virginia at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

### Washington

295.     Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Washington at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**West Virginia**

296.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in West Virginia at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Wisconsin**

297.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Wisconsin at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable for Surescripts to accept and retain the benefits received without compensating the Damages Class.

**Wyoming**

298.    Surescripts unlawfully overcharged members of the Damages Class, who paid for routing in Wyoming at prices that were more than they would have been but for Surescripts's actions. Surescripts received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Surescripts has benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for routing. It is inequitable

for Surescripts to accept and retain the benefits received without compensating the Damages Class.

## XII. DEMAND FOR RELIEF

299. Accordingly, Plaintiff, on behalf of itself and the proposed classes, respectfully demands that the Court:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the classes, and declare Plaintiff as named representative of the classes;

(b) Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

(c) Enter judgment against Surescripts and in favor of Plaintiff and the classes;

(d) Award damages (*i.e.*, three times overcharges) to the Damages Class in an amount to be determined at trial, plus interest in accordance with law;

(e) Enter injunctive relief to stop Surescripts's unlawful conduct;

(f) Grant Plaintiff and the Damages Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Surescripts's unjust enrichment;

(g) Award Plaintiff and the classes their costs of suit, including reasonable attorneys' fees as provided by law; and

(h) Award such further and additional relief as is necessary to correct for the anticompetitive market effects Surescripts's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## XIII. JURY DEMAND

300. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed classes, demand a trial by jury on all issues so triable.

Dated: July 27, 2020                                    Respectfully submitted,


By:       */s/ Michael J. Freed*

Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
**FREED KANNER LONDON
  & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

Gregory S. Asciolla (*pro hac vice forthcoming*)
Karin E. Garvey (*pro hac vice forthcoming*)
Theodore J. Hawkins (*pro hac vice forthcoming*)
Jonathan S. Crevier (*pro hac vice forthcoming*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
thawkins@labaton.com
jcrevier@labaton.com

*Attorneys for Ivan Pharmacy and the
Proposed Classes*